**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

HEATHER E. EDWARDS,                                    Case No. 1:17-cv-30

             Plaintiff,                                    Barrett, J.
                                                       Bowman, M.J.

     v.


COMMISSIONER OF SOCIAL SECURITY,

             Defendant.


**REPORT AND RECOMMENDATION**

Plaintiff Heather Edwards filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents three claims of error for this Court's review.  As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

**I.  Summary of Administrative Record**

Plaintiff first sought social security benefits based upon allegations of disability beginning in 2011.  Her claims were denied initially and upon reconsideration, and she requested an evidentiary hearing before an administrative law judge ("ALJ"), Amelia Lombardo, who subsequently also denied her claims in a written decision dated January 23, 2013.  (Tr. 107-120).

On February 22, 2013, Plaintiff filed new applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning on January 25, 2013, two days after the prior adverse decision, based on multiple physical and mental impairments.  After her claims were denied initially and

1

upon reconsideration, Plaintiff again requested an evidentiary hearing before an ALJ. On April 17, 2015, she appeared with counsel and gave testimony before ALJ Henry Kramzyk; a vocational expert also testified. (Tr. 39-103). ALJ Kramzyk determined that new and material evidence showed a change in Plaintiff's condition, such that he was not bound by the previous ALJ's findings concerning Plaintiff's residual functional capacity for work activity. *See Drummond v. Com'r of Soc Sec.*, 126 F.3d 837 (6th Cir. 1997). Nevertheless, after reviewing the new evidence including a new diagnosis of fibromyalgia, ALJ Kramzyk issued a new adverse written decision on September 23, 2015, concluding that Plaintiff was not disabled. (Tr. 17-32).

Plaintiff was 39 years old at the time of her hearing. She has at least a high school education,[1] and lives with her stepfather and 12 year old disabled son. She has past relevant work as a tufting machine operator, a machine packager, an inventory control clerk, and a shaping machine operator.

The ALJ determined that Plaintiff has severe impairments of fibromyalgia, major depressive disorder, panic disorder, and general anxiety disorder with social phobia. Although Plaintiff initially alleged disability due to additional impairments including but not limited to degenerative bone deterioration in her shoulders, lower back, hips, groin area, both knees and right ankle, bilateral carpal tunnel syndrome, and chronic obstructive pulmonary disease ("COPD"), the ALJ determined that none of those impairments were "severe." (Tr. 20, 23). At the hearing, Plaintiff additionally testified to tendonitis and a bone spur in her right ankle and irritable bowel syndrome, which the ALJ also found were nonsevere. (*Id.*). None of Plaintiff's impairments, either alone or in

---

[1]Plaintiff testified that she obtained a bachelor's degree, apparently from an on-line university. (Tr. 115, noting Plaintiff's report that she took online college courses through August 2012).

combination, meet or medically equal any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr. 20).

It is undisputed that Plaintiff's impairments preclude her from performing any of her past work. (Tr. 30). However, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform work at a light level, with additional non-exertional limitations,

> meaning she can lift or carry 20 pounds occasionally and 10 pounds frequently, can sit for up to 6 hours a day, and can stand and/or walk for up to 6 hours a day. She can occasionally operate foot controls with the right lower extremity. She can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps or stairs. She can occasionally balance, stoop, or crouch. She can never kneel or crawl. She can frequently do handling and fingering with both hands. She is able to understand, remember, and carry out short, simple, repetitive instructions. She is able to sustain attention and concentration for 2-hour periods at a time and for 8 hours in the workday on short, simple, repetitive instructions. She can use judgment in making work decisions related to short, simple, repetitive instructions. She requires an occupation with only occasional co-worker contact and supervision. She requires an occupation with set routine and procedures, and few changes during the workday. She requires an occupation with only superficial contact with the public on routine matters. She cannot perform fast-paced production work. She can maintain regular attendance and be punctual within customary tolerances. She can perform activities within a schedule. She must avoid concentrated exposure to wetness, including wet, slippery, uneven surfaces. She must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. She must avoid concentrated exposure to hazards, such as unprotected heights and dangerous machinery.

(Tr. 22-23). Although still within the "light" exertional range, the RFC determined by ALJ Kramzyk in September 2015 was significantly more limited than the RFC previously determined by ALJ Lombardo in January 2013, when Plaintiff had limitations only to "low stress work" with "frequent fingering and handling." (Tr. 112).

Based upon her limitations and testimony from the vocational expert, the ALJ determined that Plaintiff remained capable of performing a significant number of

unskilled jobs that exist in the national economy, including the representative occupations of production assembler, small products assembler, and packaging line worker. (Tr. 31). Therefore, the ALJ concluded that Plaintiff is not under a disability. The Appeals Council denied review, leading Plaintiff to file this judicial appeal.

In her Statement of Errors, Plaintiff argues that the ALJ erred by: (1) failing to consider evidence that Plaintiff would have an excessive level of absenteeism due to the number of her doctor's appointments; (2) improperly assessing Plaintiff's credibility; and (3) giving "little weight" to the opinions of Plaintiff's therapist. I find no reversible error.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence

4

supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Plaintiff's Claims of Error**

**1. Plaintiff's Level of Absenteeism**

Plaintiff's first claim is that the ALJ erred by failing to find that she would be absent too often from work, because she attends so many counseling and other appointments for a variety of ailments, such that she simply could not maintain a regular work schedule. Consistent with this assertion, Plaintiff testified that she was terminated from her last job in 2010 (well before her 2013 disability onset date) due to "constantly missing work for doctors' appointments or missing, you know, partial days." (Tr. 50). She testified that she continues to see her mental health therapist, Julie Clendenen, P.C.C., with whom she has treated since July 2011, either once or twice a month. (Tr. 71). Plaintiff also testified to the accuracy of a personal log of medical appointments that she maintained, reflecting appointments attended or scheduled from January 2014 through July 2015. (Tr. 82-84, 1014-1015). According to that handwritten document, she attended a total of 40 appointments in 2014, ranging from appointments with various physicians, to unspecified "testing," to counseling or therapy appointments.

As additional evidence, Plaintiff cites records from a pain management doctor, Dr. Baresh, that reflect she treated 12 times with that physician in 2013, through October.[2] It is worth noting, however, that the medical necessity for Plaintiff's treatment with Dr. Baresh is unclear. Dr. Baresh advised Plaintiff in October 2013 that he could not continue to prescribe opioids to Plaintiff for her alleged pain, because all medical evidence including imaging studies revealed normal findings, and "we must have

---

[2]Plaintiff also reported attending a total of 20 appointments in 2011, and 21 appointments in 2012, including appointments for x-rays and a pulmonary function test. (Doc. 10 at 4, citing Tr. 376-377). Evidence of Plaintiff's appointment history prior to her alleged onset date of January 23, 2013 has little relevance to this appeal.

legitimate reason to [prescribe] pain meds." (Tr. 688). Dr. Baresh advised that other physicians could prescribe non-opioid medications for her condition. Aside from her appointments over the specified 10-month period with Dr. Baresh, Plaintiff's appointments for physical complaints (including for several maladies that the ALJ deemed to be "non-severe") were sporadic.

Overall, Plaintiff's mental health appointments comprise the most frequent basis for medical treatment. The record reflects that Plaintiff began therapy with Julie Clendenen, P.C.C., in July 2011. Plaintiff makes much of the fact that she has attended more than 100 counseling sessions with her therapist, although the vast majority of those appointments occurred prior to her disability onset date in this case. The ALJ briefly referenced Ms. Clendenen's written report that Plaintiff averaged "2 to 6 sessions monthly" from July 2011 through April 2015.[3] (Tr. 24, citing Tr. 1012).

Plaintiff concedes that Ms. Clendenen's statement regarding her average number of appointments "may be on the high side." (Doc. 10 at 4, n.1). That concession is a charitable one, as the records before the ALJ reflect a much lower frequency. During the most intense period of treatment in the disability period at issue, the first seven months of 2013, records reflect slightly less than 4 appointments per month. (Tr. 1020-1046). However, over the next seven months through March 2014, Ms. Clendenen's clinical notes support only one appointment per month. (Tr. 1049-1056; *see also* Tr. 1050, discussing reduction of sessions to once per month due to change in benefits).

_____

[3]Plaintiff boldly proclaims that "there is no disagreement as to the frequency" of her appointments or expected absenteeism (Doc. 10 at 9). Plaintiff clearly presumes too much. The ALJ does <u>not</u> include any express finding concerning the frequency of necessary medical treatment, other than a brief reference to Ms. Clendenen's inaccurate report. By expressly concluding that Plaintiff could maintain a regular work schedule, the ALJ rejected Plaintiff's argument that she would be absent at an unsustainable rate. For the reasons discussed, Plaintiff's contention that the ALJ was required to more explicitly articulate the basis for that conclusion is not persuasive.

Additional records from Ms. Clendenen report a frequency of not more than 1.5 appointments per month with Ms. Clendenen over most of the disability period at issue in this appeal. (*Compare, e.g.*, Tr. 643, 900, 978, 1000, reporting total number of sessions over time, comprising 36 sessions over 24 month period between 4/10/13 and 4/5/15).

Regardless of the inaccurate statement by Ms. Clendenen regarding the frequency of her treatment, Plaintiff maintains that if one considers <u>all</u> of her appointments in combination, including those with her psychiatrist, her therapist/counselor, and for various ailments (a rheumatologist, podiatrist, gastroenterologist, pain management specialist, and family doctor, plus associated testing or imaging studies), her total number of appointments is consistent with Ms. Clendenen's suggestion of 4-6 appointments per month. Plaintiff insists that her attendance at so many appointments renders her disabled. The vocational expert confirmed that in the unskilled labor market, two or more absences per month would be work-preclusive. (Tr. 98-102).

Contrary to Plaintiff's argument, however, the ALJ specifically found that Plaintiff "can maintain regular attendance and be punctual within customary tolerances. She can perform activities within a schedule." (Tr. 22). Plaintiff speculates that the ALJ may not have properly considered all of her appointments. Alternatively, Plaintiff maintains that reversal is required because the "mechanics of treatment" (the frequency of her appointments) would result in excessive absenteeism. *See Miller v. Astrue*, Case No. 1:12-cv-16, 2012 WL 6644390 (S.D. Ohio Dec. 20, 2012), *adopted*, 2013 WL 360375 (Jan. 30, 2013),

The record presents a serious question about the medical necessity for many of Plaintiff's frequent appointments during the relevant disability period of January 25, 2013 through September 23, 2015, following her fibromyalgia diagnosis. (*See, e.g.*, Tr. 688). However, even assuming that all of Plaintiff's appointments were necessary, the most frequent appointments (with Ms. Clendenen) spanned just 45-60 minutes, and as noted, averaged not more than 1.5 appointments per month over most of the disability period. Plaintiff has not offered any evidence that her therapy sessions or other appointments could only be scheduled during working hours, as opposed to before or after an 8-hour shift, or that such appointments would require Plaintiff's full-day absences from work. By contrast, in the case relied upon by Plaintiff, the claimant presented much stronger evidence of the medical necessity for frequent and lengthy appointments. In *Miller*, the plaintiff had active immune thrombocytopenic purpura ("ITP"). Both the plaintiff and her physician provided unrebutted evidence that this bleeding disorder required weekly two-hour Nplate injections, with appointments that were scheduled every Friday. *Id.*, 2012 WL 6644390 at *10. Even then, this Court did not reverse, but instead remanded for further development of the record based upon the ALJ's failure to discuss the frequency of this necessary treatment, with specific instructions to conduct additional fact-finding to determine "whether those treatments can be arranged during non-work hours." (*Id.* at *10).

The facts presented by Plaintiff here are much closer to those presented in *Robinson v. Astrue*, Case No. 1:10-cv-689, 2011 WL 6217436 (S.D. Ohio Dec. 14, 2011), than the facts presented in *Miller*.[4] In *Robinson*, this Court declined to remand

---

[4]As noted by the Commissioner, a third unpublished case cited by Plaintiff, *Isbel v. Com'r*, Case No. 1:06-cv-384, 2008 WL 2676363 (S.D. Ohio July 2, 2008) is also clearly distinguishable.

where the plaintiff made a similar argument that she would too frequently miss work for treatment for her multiple sclerosis, in combination with other appointments for other conditions. Consistent with the record in this case, this Court noted there were no medical opinions about the plaintiff's "need for treatment during working hours." *Id.* at *5. The Court further noted that the plaintiff's physical and occupational therapy sessions typically lasted only about an hour, which would not require missing a full day of work. *Id.* at *6-7. Finally, many of the plaintiff's appointments were for treatment of relatively minor conditions, as opposed to the condition on which her disability claim was based, and the records suggested a number of conditions that had "more or less stabilized," implying a need for less frequent treatment in the future. *Id.* at *6.

It remains Plaintiff's burden of proof to show that she is disabled. She has failed to present any evidence that her various appointments are required to be scheduled during working hours, or on certain days of the week, or that they could not be scheduled in a manner that would minimize absenteeism. In formulating Plaintiff's RFC, the ALJ was required to incorporate only those limitations that he determined were credible. *Griffeth v. Com'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007).

## 2. The ALJ's Credibility Assessment

Plaintiff next asserts that the ALJ erred in assessing her subjective complaints as "not entirely credible." (Tr. 24). An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.

2001).  Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387.

The ALJ noted several inconsistencies in the records.  He found that although the medical evidence showed that Plaintiff's mental impairments cause some limitations, her

> noncompliance with prescribed medical treatment has made these conditions appear more severe than they otherwise would. The periods of increased severity in the medical evidence…correlate with the periods that the claimant was either not taking her prescribed medication or her physician had discontinued her medication for noncompliance.  At her consultative examination, after she restarted her mental health medication, the claimant told Dr. Chiappone that her anxiety medication was effective in preventing panic attacks…. Additionally, during this period of alleged mental disability, the claimant was able to go on dates and maintain a relationship with a new boyfriend….These actions contradict her allegations of debilitating social anxiety…

(Tr. 25).

The ALJ also found that the record did not support Plaintiff's allegations regarding the severity of her physical symptoms from fibromyalgia.  The ALJ pointed out that Plaintiff's diagnosis was repeatedly confirmed, but that Plaintiff continued to question that diagnosis in 2013 and 2014.  The ALJ was critical of Plaintiff's choice not to fully comply with prescribed treatment. (Tr. 25-26, noting report that she was taking only half the prescribed dose of medication, and second report that she had stopped the medication altogether).  At a December 2014 appointment, Dr. Schaublin again agreed with the diagnosis and declined Plaintiff's request to refer her for MRI studies for her reported neck and back pain. Although he eventually ordered an MRI of Plaintiff's cervical spine, that 2014 report showed only mild degenerative changes. (Tr. 26).  Dr.

Schaublin recommended increasing the dosing of the fibromyalgia medication that Plaintiff had used intermittently.

The ALJ also discounted Plaintiff's credibility concerning her physical complaints after noting that, notwithstanding Plaintiff's myriad complaints of multiple musculoskelatal impairments, none of those impairments caused "more than minimal limitation" in her ability to work. For example, multiple bone scans and x-rays all were found to be essentially normal by Dr. Beresh in October 2013. Dr. Beresh declined to prescribe pain medication because he could not find a legitimate reason to do so. In addition, although Plaintiff claimed that Dr. Alappat had diagnosed a "degenerative bone deterioration," Plaintiff's medical records contain no such diagnosis either from Dr. Alappat or from any other physician. (Tr. 28)

The ALJ went on to describe the lack of evidence to support Plaintiff's various other claims of physical impairment, such as impairment in her right ankle and alleged COPD. "Out of an abundance of caution," and giving Plaintiff the benefit of the doubt, the ALJ limited Plaintiff to "only occasional operation of foot controls with the right lower extremity" and required her to "avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation." (Tr. 27). The ALJ reached similar conclusions regarding Plaintiff's carpal tunnel syndrome, which was described as "mild," but which the ALJ generously found to be "consistent with her ability to frequently handle and finger bilaterally." (*Id*). By contrast, there was no evidence to support any added limitation from irritable bowel syndrome. Although Plaintiff's primary care physician, Dr. Dey, made that diagnosis based on her reported symptoms, he also noted on examination that Plaintiff had normal bowel sounds and no bruits. The record also reflects she reported her IBS symptoms only intermittently. (Tr. 28).

12

The ALJ summed up his analysis of Plaintiff's credibility regarding both mental and physical complaints as follows:

> In general, the claimant's allegations are not fully credible. The claimant has reported a broad array of impairments, many of which find little to no support in the medical evidence of record. Although the claimant alleges several musculoskeletal impairments, as Dr. Beresh noted at his October 2013 pain management evaluation, the claimant's medical imaging did not reveal any such impairments…. Dr. Schaublin's March 2014 imaging of the claimant's cervical spine also failed to support the claimant's allegations of a physical impairment in the claimant's spine…. As noted above, the evidence of diffuse pain with related anxiety, depression, and other impairments supports the diagnosis of fibromyalgia rather than any of the claimant's alleged physical impairments. However, despite receiving this diagnosis from her physicians, the claimant has consistently exhibited noncompliance with her prescribed fibromyalgia medications. Recent treatment records from the claimant's rheumatologist show that she has stopped taking her Savella entirely…. She has also failed to comply with prescribed medication for anxiety and depression…. This noncompliance detracts from the overall credibility of the claimant's testimony. Additionally, despite the claimant's allegations of ankle and knee impairments, she did not come to the hearing with a cane.

(Tr. 28).

Plaintiff admits that the ALJ's analysis of her multiple claims of various physical impairments is "very satisfactory" and "makes no argument" as to the ALJ's findings in that respect. (Doc. 10 at 11). As suggested by the ALJ's analysis, the credibility determination was strongly supported by numerous records that either refuted entirely or severely undercut Plaintiff's allegations of a wide array of allegedly disabling symptoms alleged to be caused by multiple diagnoses. In addition to the examples specifically cited above, Plaintiff testified that her knees "have a tendency to give out" at the hearing (Tr. 69) but x-rays in August 2013 showed no abnormalities. (Tr. 740). Plaintiff alleged she could not grasp objects well and that her hands were swollen and hurt (Tr. 337), but a 2010 nerve conduction study showed only mild neuropathy consistent with carpal tunnel syndrome (which the evidence showed was mild and non-

severe), and a 2013 x-ray was essentially normal. (Tr. 26, 592-593). *Compare also, e.g.,* Tr. 337 (Plaintiff's allegations that her impairments caused significant physical limitations including limiting "all" of her "ranges of motion") with Tr. 750 (exam on September 2013 noting normal range of motion). In short, the ALJ's discussion of the medical records that contradicted Plaintiff's allegations of disability from a variety of ailments is supported by substantial evidence. That analysis alone supports the adverse credibility determination made in this case.

Despite her concession to the ALJ's "very satisfactory" analysis of many claims, Plaintiff argues that the ALJ's credibility determination should be reversed based upon alleged errors in his analysis of her fibromyalgia symptoms. Plaintiff argues that the fact that she continually sought alternative diagnoses (particularly for non-existent spine issues) and alternative treatment for other symptoms should have been interpreted by the ALJ as bolstering her credibility, rather than undermining it. Plaintiff reasons that if she was not actually experiencing a disabling level of symptoms, she would not have continued to seek other treatment, including but not limited to a pain management specialist. She posits that she may have been "misguided in resisting the fibromyalgia diagnosis" but that she was not "trying to deceive anyone." (Doc. 10 at 12). Plaintiff also argues that the ALJ erred in criticizing her medication noncompliance for fibromyalgia, since he also acknowledged that, at least at one point, her noncompliance was due to insurance approval (Tr. 25), and she complained of side effects. (Tr. 25-26).

Viewing the record as a whole, I conclude that any error was harmless. Despite Plaintiff's advocacy for an alternative interpretation of the evidence, the ALJ's interpretation of the totality of the evidence as undermining Plaintiff's unsubstantiated physical complaints was reasonable.

14

Plaintiff also complains that the ALJ erred in assessing her credibility concerning the level of her mental impairment. She accuses the ALJ of "cherry-pick[ing]" her mental health records and unfairly pulling out isolated statements about her dating history. Additionally, Plaintiff complains that some of the ALJ's references were to mental health records on dates that preceded her January 25, 2013 disability onset date by up to two weeks. She further argues that the ALJ selectively sampled records from March to June 2013, from August and September 2013 and from March 2014, (*see* Tr. 24), without discussing other records in which her therapist recorded that she expressed feeling "very depressed" or "more depressed." (*See, e.g.,* Tr. 1044, 1046, 1049-53, 1056). However, having reviewed <u>all</u> of Plaintiff's mental health records in this case, the undersigned again finds no error.

SSR 96-7p, 1996 WL 374186,[5] permitted the ALJ to consider the many inconsistencies in Plaintiff's statements and in the record as a whole. In March 2013, Plaintiff reported that she does not socialize, date or go out with or talk on the phone with friends (Tr. 339), but just two weeks before her disability onset date, she reported going on a lunch date. (Tr. 1018). The fact that the ALJ cited some records dated days before her disability onset date does not require reversal, as the ALJ also cited a record in May 2013, <u>after</u> her onset date, in which she complained that a new boyfriend who was "too needy." (Tr. 24, 1036).[6] Plaintiff discussed the same boyfriend at several additional appointments with Ms. Clendenen. (Tr. 1038-40, 1042-43). In her reply, Plaintiff suggests that the inconsistency should not have been used to discredit her

---

[5]As the parties note, SSR 16-3p rescinded and superseded SSR 96-7p, but did not become effective until March 28, 2016, after the decision in this case. SSR 16-3p, 2016 WL1237954.
[6]In addition to the records cited by the ALJ, in April 2013 Plaintiff reported her hobbies and interests included reading, cleaning, fishing and swimming. (Tr. 816).

March 2013 statement because "[p]eople's lives can change in two months" resulting in increased social interaction over time. That argument does not detract from this Court's conclusion that the ALJ's assessment - that Plaintiff reported a higher level of social impairment than was supported in the record - is supported by substantial evidence.

Additionally, I find no error in the ALJ's consideration of other inconsistencies in the therapy notes in assessing Plaintiff's overall credibility. The ALJ accurately cited a number of records in 2013 and 2014. The additional records cited by Plaintiff do not alter the existence of the substantial evidence – evident both in the records cited by the ALJ and in the record as a whole[7] – that support his conclusion that Plaintiff's allegations of disabling mental limitations were not fully credible. "[A]n ALJ's failure to cite specific evidence does not indicate that it was not considered." *Daniels v. Com'r of Soc. Sec.*, 152 Fed. Appx. 485, 489 (6th Cir. 2005).

### 3. Weight Given to Therapist's Opinions

Plaintiff's final claim is that the ALJ erred by failing to adequately explain the weight that he gave to the opinions of her therapist, Ms. Clendenen, under SSR 06-3p. *See also* 20 C.F.R. §404.1527(d)(4); §416.913(d)(4). It is important to note that Ms. Clendenen was not a treating physician and does not qualify as an "acceptable medical source" under SSR 06-3p[8] or the cited regulations, because she is not a physician or licensed psychologist. Instead, she is identified as an "other medical source." *Id.* Technically, only an "acceptable medical source" can provide a "medical opinion,"

---

[7]Dr. Chiappone's report of May 21, 2013 noted a number of inconsistent statements made by Plaintiff during her evaluation. (Tr. 655-664). On March 10, 2014, Plaintiff denied any limitations of her activities of daily living. While primarily complaining of cognitive symptoms, she was able to recall all of the recent details of her medical issues and symptoms, including appointments and test results. (Tr. 850). Neurological exams on that day and on two other occasions reflected a "euthymic" (normal) affect with normal expression, language and content. (*See, e.g.*, Tr. 851).

[8]SSR 06-3p has been rescinded for cases initiated after March 27, 2017.

although relevant evidence from "other sources" like Ms. Clendenen still should be considered. "Opinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* Despite requiring consideration of such opinions, SSR 06-3p distinguishes "between what an adjudicator must *consider* and what the adjudicator must *explain* in the disability determination or decision." *Id.* (emphasis added).

Ms. Clendenen was not reticent about offering opinions concerning Plaintiff's condition, including her reported symptoms, diagnosis, prognosis, and mental limitations resulting therefrom. In addition to treatment notes from Ms. Clendenen, the record contains "Psychological Evaluation" reports dated April 10, 2013, February 1, 2014, October 10, 2014, January 17, 2015, and April 5, 2015. (Tr. 643-646, 841-844, Tr. 900-904, 976-980, 1000-04), a "Mental Impairment Questionnaire" dated October 1, 2014 based on Listings 12.04 and 12.06 (Tr. 906-909), and a "Treatment Plan – Authorization Request" dated July 1, 2013. (Tr. 1047-1048).

Notably, in the functional "Questionnaire," Ms. Clendenen opines that Plaintiff has "marked" or "extreme" limitations in multiple areas that would be work-preclusive, as well as "repeated episodes of decompensation, each of extended duration." (Tr. 907).[9] Although Plaintiff does not claim she meets a Listing in this appeal, if the ALJ had accepted her therapist's opinions, he would have been required to conclude that Plaintiff meets or equals a Listed mental health impairment at Step 3 of the sequential process.

---

[9]Other than Ms. Clendenden's conclusory statement, there is no record of any episodes of decompensation of extended duration.

(*See* Tr. 907-908).  She also opines that Plaintiff, who she describes as a "very kind lady," is so severely impaired by her mental impairments that "leaving her home [is] almost impossible."  (Tr. 909).

The ALJ gave little weight to Ms. Clendenen's opinions that Plaintiff had a disabling level of impairment in part because the medical evidence demonstrated that Plaintiff's "noncompliance with prescribed medical treatment has made [her mental conditions] appear more severe than they otherwise would," (Tr. 25), and because he determined the opinions were not well-supported and were inconsistent with Ms. Clendenen's own clinical records, as well as with other well-supported opinions from acceptable medical sources.  (Tr. 29).  The ALJ accurately summarized the opinions of two non-examining state agency psychological consultants, as well as the opinions of examiner Dr. Chiappone, before turning to the opinions offered by Ms. Clendenen.

> On April 10, 2013, Ms. Clendenen submitted a medical source statement that assigned the claimant a GAF of 45, indicating that she exhibited serious symptoms or serious impairment in social, occupational, or school functioning…[Tr. 644].  On February 1, 2014, Ms. Clenden submitted another medical source statement with the same GAF score… [Tr. 842]. Additionally, on October 1, 2014, Ms. Clendenen submitted a mental impairment questionnaire opining that the claimant had either marked or extreme limitation in her ability to participate in the majority of mental work activities…[Tr. 907-908].  On October 10, 2014, Ms. Clendenen offered a third medical source statement with a GAF score of 50, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning…[Tr. 902]. On January 17, 2015, Ms. Clendenen submitted an additional medication source statement, assigning a GAF score of 50…[Tr. 978]. Finally, on April 5, 2015, Ms. Clendenen submitted a medical source statement assigning the claimant a GAF score of 45…[Tr. 1002].  Each of these opinions note that the claimant had a poor prognosis to return to work due to the nature, duration, and severity of her condition….  Each medical source statement also opined that the claimant exhibited moderate to poor abilities in all areas of work functioning….  The undersigned gives Ms. Clendenen's opinions little weight because they are not consistent with the other evaluations of the claimant's mental impairments in the record or Ms. Clendenen's own therapy notes and Ms. Clendenen has provided little support for the severity of her opinions.

(Tr. 29).

Plaintiff begins her argument by criticizing the Social Security Administration's initial failure to obtain all of the "treatment notes of Ms. Clendenen at either the Initial or Reconsideration stages," (Doc. 10 at 5), but then acknowledges that the records were "extraordinarily difficult to obtain" for counsel, who submitted them after the hearing. (Doc. 10 at 4, n.2). However, the initial agency consultants did have access to Ms. Clendenen's April 2013 report, which four page report corresponds nearly verbatim with her February 2014 report,[10] and which was reasonably discounted as relying too heavily on the subjective reports of the Plaintiff herself, without substantial support from other evidence of record. (Tr. 136, 169-170). The ALJ held the record open so that Plaintiff could submit additional clinical records prior to rendering his decision, and obviously closely reviewed and considered those clinical notes.

As reflected above, the ALJ discussed the details of many of the therapist's notes, explaining the basis for his conclusion that the "notes indicate that the claimant experienced depression and anxiety throughout that [treatment] period, but they also show that her condition improved with medication and related to specific life events." (Tr. 24, citing records reflecting Plaintiff's social interactions, new boyfriend, and correlation of increase in symptoms with the cancelation of her Klonopin prescription for non-compliance, despite prior reports that Klonopin helped her, as well as reports of "recurring panic attacks" without any explanation of their frequency or severity). Ms.

---

[10]The only difference between the first two reports is the reported number of sessions and the addition of a sentence reporting "a decrease in symptoms and improved functioning with weekly therapy sessions" in the later 2014 report. (Tr. 843). As previously noted, the reports reflect a treatment frequency of much less than the "weekly therapy sessions" described in both reports. In addition, all of Ms. Clendenen's reports focus heavily on Plaintiff's physical complaints, reciting Plaintiff's reported diagnoses (including but not limited to the diagnosis of degenerative bone disease (later disproven) and a pulmonary condition that the ALJ found not to be severe. (*See, e.g.*, Tr. 844, recommending that Plaintiff see a lung specialist and pain clinic as well as other clinicians for additional care).

Clendenen's February 2014 report also indicates improvement in Plaintiff's condition. (Tr. 843).

The ALJ pointed out that at a psychological consultative examination in May 2013, David Chiappone, Ph.D., noted that Plaintiff did not appear to be anxious, with no motoric or autonomic signs of anxiety, and no signs of hypervigilance. Despite reporting panic attacks "very often," she also reported that she used to have attacks on a daily basis, but that her medication had helped to prevent them. She also stated that she used to worry in the past, but that "Now I don't care." By the date of Dr. Chiappone's report, she had resumed taking Klonopin, and began another medication (Buproprion) in June 2013. (Tr. 25).

The undersigned has closely reviewed Ms. Clendenen's clinical records, and easily finds substantial evidence to affirm the ALJ's decision to give her opinions "little weight." The opinions are replete with statements that indicate Ms. Clendenen's heavy reliance on Plaintiff's subjective reports, with no other evidentiary support. (*See, e.g.*, Tr. 644-645, multiple references to "[p]er client report"). Ms. Clendenen opines that Plaintiff has poor functional work abilities but recites the genesis of those opinions "[a]s observed in session **or** by client report." (Tr. 645, 843, 902, emphasis added). In contrast to her extreme opinions regarding Plaintiff's limitations, Ms. Clendenen's clinical notes often assess Plaintiff's mood as only "moderately" depressed, with speech within normal limits, intact associations, and no elevated psychomotor behaviors. (*See, e.g.*, Tr. 1025, 1027, 1030, 1039-1046, 1049, 1056). As pointed out by the ALJ, some of the GAF scores that Ms. Clendenen assessed are consistent with no more than moderate symptoms and limitations. (*See* Tr. 902, 978; *see also* Tr. 644, 842, 1002 (reporting GAF score of 55 in past year, despite "current" score of 45).

Other inconsistencies are also apparent. For example, Ms. Clendenen opines that Plaintiff has marked limitation in her ability to understand, remember and carry out even very simple instructions, and no useful ability to understand, remember or carry out detailed but not complex instructions, and "marked" abilities to perform all activities of daily living including caring for grooming and hygiene (Tr. 907, 909). Yet Plaintiff reported no problems with personal care and indicated that she is able to prepare simple meals, perform basic cleaning including dusting, and vacuuming, and is able to drive to take her son to school or go to doctors' appointments. (Tr. 21). Undermining Ms. Clendenen's opinions on Plaintiff's level of impairment with attention, memory and concentration, she stated in multiple assessments that Plaintiff "was able to sit through [an] hour and half diagnostic assessment and answer questions. Speech was fluid and lucid." (Tr. 900, 976, 1000). Ms. Clendenen's opinions concerning Plaintiff's limitations in attention and concentration also were inconsistent with multiple neurological consultations by Dr. Schaublin reflecting normal attention and concentration, (Tr. 745, 754, 851), as well as the opinions of Dr. Chiappone concerning the same functional areas. (Tr. 662-665). Acceptable medical sources like Drs. Schaublin, Chiappone, and even the non-examining consulting psychologists may be given more weight than someone like Ms. Clendenen who is not an acceptable medical source, particularly when, as here, the "other source" provided so little support for such extreme limitations.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

_/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

HEATHER E. EDWARDS,                                    Case No. 1:17-cv-30

           Plaintiff,                                    Barrett, J.
                                                                 Bowman, M.J.
    v.

COMMISSIONER OF SOCIAL SECURITY,

           Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).